Bernard D. SPECTOR,
Petitioner-Appellee,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellant.

No. 79–3394.

United States Court of Appeals,
Fifth Circuit.
Unit A

April 3, 1981.

M. Carr Ferguson, Asst. Atty. Gen., Tax Div., U. S. Dept. of Justice, Gary R. Allen and Karl P. Fryzel, Attys., N. Jerold Cohen, Acting Chief, Appellant Section, I. R. S., Washington, D.C., for respondent-appellant.

Bernard D. Spector, pro se.

Before WISDOM, POLITZ and SAM D. JOHNSON, Circuit Judges.

SAM D. JOHNSON, Circuit Judge:

In this suit brought against the Commissioner of Internal Revenue for redetermination of tax deficiencies for the years 1972 and 1973, the principal issue is whether a transaction in which taxpayer surrendered his partnership interest in an accounting firm in exchange for a specified sum constitutes a "sale" of his partnership interest, thus creating long term capital gain under section 741 of the Internal Revenue Code of 1954, or whether the transaction was a "liquidation" of taxpayer's interest under section 707(c), thus producing ordinary income

gain under section 736(a)(2). The Commissioner determined on audit that taxpayer was bound to the transaction as structured by the parties, and that it therefore was a liquidation of taxpayer's interest, producing ordinary income gain. The Tax Court, 71 T.C. 1017, reversed the Commissioner's determination, and held that the transaction was a sale, although it was structured and consumated by all of the parties as a liquidation. For reasons that follow, the decision of the Tax Court is reversed, and the case remanded for further proceedings.

## I.

Prior to 1969, taxpayer was a partner in the accounting firm of Spector, Wilson & Co. (Spector partnership). Taxpayer decided to divest himself of his practice with that firm, and to work exclusively for a single client. Consequently, in the early part of 1969 he approached a business acquaintance, who was a partner in another accounting firm, Bielstein, LaHourcade &. Lewis (Bielstein partnership), in an effort to dispose of his practice. Negotiations proceeded over a six week period, and culminated in a written agreement dated February 24, 1969, which provided for the sale of the Spector partnership's accounts receivable to the Bielstein partnership, for the merger of the Spector and Bielstein partnerships, and for the withdrawal of taxpayer from the merged partnership, with payments to him by the merged partnership of amounts designated as "guaranteed payments to a retiring partner." Taxpayer negotiated the details of the agreement with Lewis, the tax partner of the Bielstein partnership. Paragraph 7 of the agreement provided:

> 7. In the agreement for withdrawal, Bielstein agrees to pay the $96,000 as guaranteed payments to a retiring partner with one-half explicitly allocated to an agreement not to compete for the term of the payout.

On May 2, 1969, two agreements were signed to implement the plan outlined in the February 24 agreement. The first agreement, called the "Merger Agreement," provided that the Bielstein firm would merge with the Spector firm on May 3, 1969.[1] The second agreement, called the "Withdrawal Agreement," provided that taxpayer would withdraw from the merged partnership on May 5, 1969, and would receive the agreed upon consideration from the new firm:

> In consideration of for [sic] Spector's withdrawal, Spector will be entitled to receive from the partnership for services or for the use of capital a "guaranteed payment" of $96,000 . . . .

> .    .    .    .    .

> Furthermore, none of the guaranteed payments provided for in this agreement are for partnership property within the meaning of Section 736 IRC of 1954.

> .    .    .    .    .

> The meaning attributed to the words "guaranteed payments" provided for in this contract is the definition provided for such term in Section 707 of the Internal Revenue Code of 1954 and Regulation Section 1.707–1(c).

The amount of $96,000 to be paid to taxpayer was determined by valuing his practice at one hundred percent of its average gross annual fees.

Before the bargain was struck, the tax consequences flowing from the transaction to taxpayer and to the continuing partners was a point of intense negotiation. As practicing public accountants, all of the parties to the transaction were fully aware that the tax consequences to each would depend upon how the transaction was structured. The Tax Court found that the parties structured the transaction as a merger

---

1. The Merger Agreement provided, in pertinent part:

   Bielstein, LaHourcade & Lewis and Spector & Wilson hereby agree to merge their accounting practice partnerships into one accounting practice partnership.

   The effective date of this merger is May 3, 1969.

   The partnership thus formed shall be known as Bielstein, LaHourcade & Lewis merged with Spector & Wilson.

of the two partnerships followed by taxpayer's withdrawal from the merged firm for the sole purpose of allowing the continuing partners a deduction for income tax purposes, under section 736(a)(2) of the Code, of the amounts paid to taxpayer. Indeed, the record clearly reflects that the transaction would not have been consummated absent taxpayer's written agreement on this issue; the Tax Court found that the continuing partners would not have agreed to pay to taxpayer the total compensation of $96,000 unless the transaction were structured as a deductible "liquidation" of taxpayer's interest pursuant to section 736(a)(2).[2]

Under the agreement, taxpayer was nominally a partner in the Bielstein-Spector partnership for only three days. He never actually performed any services for the partnership. He had no desk or office. He contributed no additional capital to the merged firm. At no time did any party to the transaction intend or expect taxpayer to actually engage in the practice of accounting with the members of the Bielstein-Spector partnership.[3] Simply stated, the transaction was carefully structured as a merger followed by a liquidation of taxpayer's interest for the express purpose of assuming a bargained-for tax posture, and thereby of allocating the tax consequences flowing therefrom in an agreed-upon manner.

Pursuant to the agreement, taxpayer received installments of $23,500 from the Bielstein-Spector partnership in 1972 and 1973.[4] He did not, however, report either sum as a "guaranteed payment" in liquidation of his partnership interest.[5] On audit, the Commissioner determined that the entire amount received by taxpayer in each year should have been reported as a "guaranteed payment" to a retiring partner under section 736(a)(2) and, therefore, as ordinary income. Taxpayer thereupon brought this action in the Tax Court, seeking review of the Commissioner's deficiency determination.

In attempting to avoid the tax consequences flowing from the agreement as structured by the parties, taxpayer argued before the Tax Court that the form of the transaction should be disregarded, and that the true substance of the transaction was a sale, rather than a liquidation, of taxpayer's interest. The Tax Court found that taxpayer had presented "strong proof that the agreements which he signed did not reflect reality insofar as his status as a partner in the Bielstein partnership is concerned."[6] Because taxpayer never became a real partner in the merged firm, the court concluded that "in essence the Bielstein partnership purchased [taxpayer's] share of the goodwill of Spector, Wilson & Company," and that the payments were not a "liquidation" of taxpayer's interest in the new partnership. The Tax Court therefore concluded that except to the extent the payments to taxpayer were allocated to the covenant not to compete, the transaction created long term

---

2.  Taxpayer testified that he informed the continuing partners that even though the transaction was to be structured as a liquidation, with payments to taxpayer designated as "guaranteed payments," he nonetheless intended to report the payments that he received as capital gain resulting from the "sale" of his interest pursuant to section 741. To assure that taxpayer would report at least part of the payments as ordinary income, so that the deductibility by the Bielstein-Spector partnership of at least that part would less likely be challenged, the transaction was structured to provide that half of each installment would be allocated to a covenant not to compete.

3.  Spector's partner, Wilson, however, did join the merged firm as a partner.

4.  It does not appear from the record why the payments were $23,500, rather than $24,000 as contemplated by the agreement. The parties do not attach significance to this discrepancy.

5.  Although he reported one-half of the 1972 installment as allocated to the covenant not to compete, and therefore as ordinary income, the remaining one-half was reported as long term capital gain resulting from the "sale" of his partnership interest. In his 1973 return, taxpayer reported none of that year's installment as ordinary income. At trial, taxpayer conceded that the one-half of the 1973 payment allocated to the covenant not to compete should have been reported as ordinary income.

6.  The Tax Court's opinion is reported at 71 T.C. 1017.

capital gain pursuant to section 741 of the Code rather than ordinary income gain pursuant to section 736(a)(2), as the Commissioner had determined, and set aside the Commissioner's deficiency determination to that extent.[7] In so holding, the Tax Court found it unnecessary to address taxpayer's alternative argument, i. e., that the payments made to taxpayer were for goodwill as provided in section 736(b)(2)(B) of the Code.

On appeal, the Commissioner argues that the Tax Court erred in allowing taxpayer to disavow the form of the transaction as agreed to by the parties on the mere showing that it did not comport with "economic reality." The Commissioner further argues that the Tax Court's holding is inconsistent with the policy underlying sections 736 and 741 of the Code. As an alternative to the Tax Court's approach, the Commissioner urges this Court to adopt the rule set forth in *Commissioner of Internal Revenue v. Danielson*, 378 F.2d 771 (3d Cir. 1967), *cert. denied*, 389 U.S. 858, 88 S.Ct. 94, 19 L.Ed.2d 123 (1967).

### II.

Prior to the enactment of the 1954 Code, there existed no comprehensive guidelines concerning the tax consequences resulting from a partner's withdrawal from a partnership. Subchapter K of the 1954 Code, of which sections 736 and 741 are a part, attempted to set forth the "first comprehensive statutory treatment of partners and partnerships in the history of the income tax laws." H.R.No.1337, 83d Cong. 2d Sess. p. 65, U.S.Code Cong. & Admin.News 1954, 4025. The principal objectives of the 1954 changes were "simplicity, flexibility, and equity as between the partners." *Id.*

Under Subchapter K, there are at least two ways in which withdrawing partners may characterize the disposition of their partnership interests: the transaction may be structured either as a "sale" of the partnership interest pursuant to section 741 of the Code, or as a "liquidation" of that interest pursuant to section 736. The net economic result is the same under either approach: The withdrawing partner relinquishes his or her interest in exchange for a specified payment or payments. Depending upon which approach is selected, however, the tax consequences to the withdrawing and continuing partners vary greatly. If characterized as a section 741 "sale," any tax benefits flow to the withdrawing partner, who may be permitted to report any gain that results therefrom as capital, rather than ordinary income gain. Under this selection, the payments are not deductible by the continuing partners, but simply are capitalized as the purchase price of the withdrawing partner's interest and, as such, become the cost basis of the interest so acquired. By comparison, if the transaction is structured as a section 736 "liquidation" of the withdrawing partner's interest, with the payments denominated as "guaranteed payments," the tax benefit flows to the continuing partners, who are able to deduct from partnership income the payments so made. Under this selection the withdrawing partner must report the payments as ordinary income.

From the foregoing, it is readily apparent that the withdrawing and continuing partners will have adverse tax interests. Because a partner's withdrawal generally can be structured either as a section 741 sale or as a section 736 liquidation, the form of the transaction may become a major negotiating point between the parties. Indeed, in *David A. Foxman*, 41 T.C. 535 (1964), *aff'd*, 352 F.2d 466 (3d Cir. 1965), the Tax Court, after examining the legislative history underlying Subchapter K, noted that

one of the underlying philosophic objectives of the 1954 Code was to permit partners themselves to determine their tax burdens *inter sese* to a certain extent, and this is what the committee reports meant when they referred to "flexibility." The theory was that the partners

---

**7.** The Tax Court upheld the Commission's deficiency determination on another transaction not herein relevant.

would take their prospective tax liabilities into account in bargaining with one another.

41 T.C. at 551 (footnote omitted). Relying upon these principles, the Tax Court in *Foxman* concluded:

> [T]his policy of "flexibility" is particularly pertinent in determining the tax consequences of the withdrawal of a partner. Where the practical differences between a "sale" and a "liquidation" are, at most, slight, if they exist at all, and where the tax consequences to the partners can vary greatly, it is in accord with the purpose of the statutory provisions to allow the partners themselves, through arm's length negotiations, to determine whether to take the "sale" route or the "liquidation" route, thereby allocating the tax burdens among themselves.

*Id.* at 551–52 (footnote omitted).

Unlike the section 741 "sale," the section 736 "liquidation" may occur only in transactions between a partner and his or her own partnership. *Id.* at 549. In the case *sub judice* the Tax Court, after reviewing the evidence, and applying the test set forth in *Commissioner v. Culbertson*, 337 U.S. 733, 742, 69 S.Ct. 1210, 1214, 93 L.Ed. 1659 (1949)[8] for determining the existence of a partnership, held that:

> [t]he merger of partnerships, followed by [taxpayer's] withdrawal from a "merged" partnership, as described in the agreements, never actually occurred. What did occur was a sale by [taxpayer] of his share of the goodwill of [the Spector partnership], not to his partnership or to continuing partners, but to outsiders, the

Bielstein partnership. Section 736 is, therefore, inapplicable because it applies to payments made by a partnership to one of its own partners.

(footnote omitted; citations omitted). The Commissioner does not challenge the Tax Court's finding of fact that taxpayer was not a "bona fide" partner in the Bielstein-Spector partnership.[9] Rather, the Commissioner argues that the Tax Court erred in allowing taxpayer to avoid the tax consequences of the form of the transaction as bargained for and agreed to by the parties merely by adducing "strong proof" that it did not comport with "economic reality," and that taxpayer, having knowingly and voluntarily agreed to structure the transaction as a section 736 liquidation, should be bound by his bargain.

### III.

■ Just as the Commissioner in determining income tax liabilities may look through the form of a transaction to its substance, *Commissioner of Internal Revenue v. Court Holding Co.*, 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981 (1945); *Gregory v. Helvering*, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935), so, as a general rule, may he bind a taxpayer to the form in which the taxpayer has cast a transaction.[10] In *Higgins v. Smith*, 308 U.S. 473, 60 S.Ct. 355, 358, 84 L.Ed. 406 (1940), the Supreme Court stated:

> The Government may look at actualities and upon determination that the form employed for doing business or carrying out the challenged tax event is unreal or a sham *may sustain or disregard* the effect of the fiction as best serves the pur-

---

8. The Court stated the test as

> [w]hether, considering all the facts—the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent—the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise.

9. In any event, the evidence is more than sufficient to establish that taxpayer never participated as a partner in the merged firm, nor did any of the parties to the transaction contemplate that he would do so.

10. As the court noted in *Proulx v. United States*, 594 F.2d 832, 833 n.1 (Ct.Cl. 1979), "[t]his form-substance maxim has been referred to by Judge Learned Hand as an 'anodyne(s) for the pains of reasoning,'" *quoting Commissioner v. Sansome*, 60 F.2d 931, 933 (2d Cir.), *cert. denied* 287 U.S. 667, 53 S.Ct. 291, 77 L.Ed. 575 (1932).

poses of the tax statute. To hold otherwise would permit the schemes of taxpayers to supersede legislation in the determination of the time and manner of taxation.

(emphasis added). *Accord: Gray v. Powell*, 314 U.S. 402, 62 S.Ct. 326, 334, 86 L.Ed. 301 (1941). More recently, the Supreme Court emphasized in *Commissioner of Internal Revenue v. National Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134, 94 S.Ct. 2129, 2137, 40 L.Ed.2d 717 (1974) that:

> This Court has observed repeatedly that, while a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice * * * and may not enjoy the benefit of some other route he might have chosen to follow but did not.

*citing Higgins v. Smith*, 308 U.S. at 477, 60 S.Ct. at 357; *Old Mission Portland Cement Co. v. Helvering*, 293 U.S. 289, 293, 55 S.Ct. 158, 160, 79 L.Ed. 367 (1934); *Gregory v. Helvering*, 293 U.S. 465, 469, 55 S.Ct. 266, 267, 79 L.Ed. 596 (1935). *See also Commissioner of Internal Revenue v. Culbertson*, 337 U.S. 733, 69 S.Ct. 1210, 1220, 93 L.Ed. 1659 (1949) (Frankfurter, J., concurring); *In Re Steen*, 509 F.2d 1398, 1402–03 n.4 (9th Cir. 1975).

Courts have recognized an exception to the foregoing principle, however, and will allow a taxpayer to challenge the form of a transaction when necessary to avoid unjust results. In cases involving contractual allocations in the sale of a business between goodwill and a covenant not to compete, this Court has adopted the rule first enunciated in *Ullman v. Commissioner*, 264 F.2d 305, 308 (2d Cir. 1959) that

> [w]hen the parties to a transaction . . . have specifically set out the covenants in the contract and have given them an assigned value, strong proof must be adduced by them in order to overcome that declaration.

*See Sonnleitner v. Commissioner of Internal Revenue*, 598 F.2d 464, 467 (5th Cir. 1979); *Dixie Finance Co., Inc. v. United States*, 474 F.2d 501 (5th Cir. 1973); *Balthrope v. Com-*

*missioner of Internal Revenue*, 356 F.2d 28 (5th Cir. 1966); *Barran v. Commissioner of Internal Revenue*, 334 F.2d 58 (5th Cir. 1964).

In the case *sub judice*, this Court is called upon to determine whether the "strong proof" rule as adopted in *Barran* and applied in subsequent decisions of this Court should be extended beyond the factual context from which that rule originated, *i. e.*, contractual allocations in covenants not to compete. So, too, it is the first case in which this Court has found it appropriate to consider the rule enunciated by the Third Circuit sitting *en banc* in *Commissioner of Internal Revenue v. Danielson*, 378 F.2d 771 (3d Cir.), *cert. denied*, 389 U.S. 858, 88 S.Ct. 94, 19 L.Ed.2d 123 (1967), and followed in subsequent decisions of both the Third Circuit and the Court of Claims. *See Sullivan v. United States*, 618 F.2d 1001 (3d Cir. 1980); *Forward Communication Corp. v. United States*, 608 F.2d 485, 490 (Ct.Cl. 1979); *Proulx v. United States*, 594 F.2d 832, 839 (Ct.Cl. 1979); *Dakan v. United States*, 492 F.2d 1192, 1193–94, 203 Ct.Cl. 655 (1974); *Connery v. United States*, 460 F.2d 1130, 1134 (3d Cir. 1972). In *Danielson*, the Third Circuit announced the rule that

> a party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc.

378 F.2d at 775. On two different occasions, this Court has found it unnecessary to approve or reject the *Danielson* rule, or to decide to what extent it may be consistent with the "strong proof" rule as adopted in this Circuit. *See Sonnleitner v. Commissioner of Internal Revenue*, 598 F.2d at 467 n.9; *Dixie Finance Co., Inc. v. United States*, 474 F.2d at 505 n.4.

In *Barran v. Commissioner of Internal Revenue*, 334 F.2d 58, 63 (5th Cir. 1964), this Court first applied the "strong proof" rule, as enunciated in *Ullman v. Commissioner*,

264 F.2d 305 (2d Cir. 1959). In *Barran*, taxpayer attempted to disavow a contractual allocation to a covenant not to compete. Holding that taxpayer had failed to adduce "strong proof," this Court refused to disregard the covenant.

In *Balthrope v. Commissioner of Internal Revenue*, 356 F.2d 28, 31 (5th Cir. 1966), this Court reviewed its earlier decision in *Barran* and stated the rule as adopted therein as "whether the payments allocated to the covenant not to compete are in fact payments for something else." This Court also noted in *Balthrope* that courts generally honor parties' agreements to allocate their tax consequences in a certain manner, but will not do so when the covenant is without "economic reality," *citing Schulz v. Commissioner of Internal Revenue*, 294 F.2d 52 (9th Cir. 1961) or was "slipped into a sales contract for tax purposes by one party to the disadvantage of a tax ignorant party." 356 F.2d at 31, 33.

*Dixie Finance Company, Inc. v. United States*, 474 F.2d 501 (5th Cir. 1973) involved two separate transactions, called the "Stewart" transaction and the "Empire" transaction. In the *Stewart* transaction, this Court affirmed the Tax Court's determination that a covenant not to compete, which accounted for $526,150 of the total $650,000 purchase price, and which taxpayers alleged was neither bargained for nor was based upon economic reality, should be disregarded in its entirety. In so holding, the Tax Court found that the agreement did not constitute an enforceable contract not to compete. This Court affirmed the Tax Court's decision, but found it unnecessary to address the Commissioner's argument that this Court should adopt the *Danielson* rule. 474 F.2d at 505 n.4.

In the *Empire* transaction, this Court was called upon to determine which of two contractual allocations should be upheld. The Court noted that whereas the first allocation was arrived at through arms length, good faith bargaining, nothing occurred in the interval between the execution of the agreement and its subsequent modification that would have reduced the initial value of the covenant to virtually nothing; consequently, the Court concluded that the modification was a sham that bore no relationship to the parties' true intent, nor to economic reality.

Finally, in *Sonnleitner v. Commissioner of Internal Revenue*, 598 F.2d 464 (5th Cir. 1979), taxpayer offered two arguments as "strong proof" that the consideration allocated to the covenant actually was in payment for the sale of his stock: (1) the covenant had no basis in economic reality because taxpayer in fact was unable to compete with the purchaser; and (2) the covenant was void because it was entered into under economic duress. In addressing taxpayer's contentions, this Court characterized the threshold question as whether "reasonable men, genuinely concerned with their economic future, might bargain for such an agreement." 598 F.2d at 467; *quoting Schulz v. Commissioner of Internal Revenue*, 294 F.2d 52, 55 (9th Cir. 1961). (citation omitted). Finding that taxpayer had failed to adduce strong proof of his contentions, this Court rejected taxpayer's arguments, and again found it unnecessary to address *Danielson*. 598 F.2d at 467 n.9.

■ As the foregoing cases indicate, when determining whether a taxpayer has adduced strong proof that a contractual allocation to a covenant not to compete in reality was in payment for something else, a major inquiry is whether the covenant bears "economic reality" to the circumstances surrounding the transaction, *i. e.*, whether the allocation to the covenant bears some relationship to its actual value. In the case *sub judice* the Tax Court limited its inquiry to this single factor and concluded that because taxpayer could not have liquidated his interest in a partnership of which he never became a member, the form of the transaction as agreed to by the parties lacked economic reality.

■ One difficulty with the Tax Court's approach is the aforementioned absence of any substantial difference in terms of "economic reality" between a section 736 liquidation and a section 741 sale of a partnership interest. In a particular case, a cove-

nant not to compete indeed may be so without value as to be devoid of "economic reality." As noted in *Foxman*, however, the fundamental theory underlying Subchapter K is that, given the substantial, if not total, identity in terms of economic net result between a sale and liquidation, the withdrawing and continuing partners should be allowed to allocate the resulting tax benefits and burdens as they see fit. Notwithstanding the fact that a section 736 liquidation may occur only in transactions between a partner and his or her own partnership, once the parties have agreed to structure the transaction in such a way as to comply with that requirement, "economic reality" does not provide a ground upon which that form can be set aside.

■ Moreover, in contrast to the Tax Court's application of the "strong proof" rule in the present case, the prior decisions of this Court reveal a concern for the type of equitable considerations that traditionally have been invoked when determining whether a party to a transaction may, in fairness, be held to its obligations arising thereunder. Whereas *Balthrope* refers to the situation in which one party, at the expense of the other, tax-ignorant, party slips a covenant into the contract, 356 F.2d at 31, 33–34, *Dixie Finance*, 474 F.2d at 504–05 and *Sonnleitner*, 598 F.2d at 467–68, place emphasis upon whether the covenants involved therein were given for value and were bargained for at arms length. Although, under the approach adopted in the foregoing cases, the absence of any relationship between "economic reality" and the agreement indeed may be strong evidence of mistake, fraud, overreaching, duress, or perhaps some other ground for equitable recission, such as inadequacy of consideration, those decisions simply do not elevate the "economic reality" inquiry to that of a talisman, and require the Commissioner to blind himself to other relevant factors. In none of those decisions did this Court allow a taxpayer, having voluntarily and at arms length bargained for a particular form of transaction, with complete foreknowledge of the tax consequences flowing therefrom, and having represented to the Com-

missioner that the chosen form reflected the true nature of the transaction, to disavow that form as a sham designed for the sole purpose of misleading the Commissioner, and, having already received substantial nontax benefits therefrom, adopt one with more favorable present tax consequences.

Indeed, this Court in an analogous factual situation has strongly rejected the notion that a taxpayer may bind the Commissioner to a secret understanding as to the effect of an agreement. In *Winn-Dixie Montgomery, Inc. v. United States*, 444 F.2d 677 (5th Cir. 1971), taxpayer argued that because it did not intend to allocate any portion of the purchase price to goodwill, the Commissioner should be bound by that determination, absent a contrary expression in the agreement. This Court responded:

> No decision holds or suggests that such a one-sided, uncommunicated apportionment of a sales price is conclusive on the taxing authorities, and it is obvious that it would be dangerous and unfair to lay down that categorical rule. The whole trend of the law in this area is against binding the Revenue Service by such a secret, unilateral, subjective allocation which is not carried over into the agreement.

444 F.2d at 682; *citing, inter alia, Commissioner of Internal Revenue v. Danielson*, 378 F.2d at 771; *Balthrope v. Commissioner of Internal Revenue*, 356 F.2d at 31–32, 34. The above-quoted admonition is particularly appropriate in the present case, and we adhere to the principle expressed therein.

## IV.

■ Having determined that the Tax Court applied an incorrect test in determining whether taxpayer should be allowed to challenge the form of the transaction as agreed to by the parties, we now turn to the Commissioner's argument that the proper test to be applied on remand is that enunciated in *Commissioner of Internal Revenue v. Danielson*, 378 F.2d 771 (3d Cir.), *cert. denied*, 389 U.S. 858, 88 S.Ct. 94, 19 L.Ed.2d 123 (1967). At the outset, we note that several policy considerations ar-

gue for application of the *Danielson* rule. First, as the court recognized in *Danielson*, "the presumed tax consequences of a transaction are not only 'important, tax wise, both to the buyer and the seller,' but also '[may] help to determine the total amount a purchaser is willing to pay for such a purchase.'" *Sullivan v. United States*, 618 F.2d 1001, 1004 (3d Cir. 1980); *quoting Danielson*, 378 F.2d at 775. Consequently, "allowing a party unilaterally to vary his agreement for tax purposes, absent evidence that would negate it in an action between the parties, 'would be in effect to grant at the instance of a party, a unilateral reformation of the contract with a resulting unjust enrichment.'" *Id.* Indeed, in the present case it is undisputed that the continuing partners would not have been willing to pay taxpayer the agreed-upon consideration of $96,000 unless the transactions were structured as a merger followed by a liquidation of taxpayer's interest.

Similarly, to allow "taxpayers to attack the form of their transaction for tax purposes 'would nullify the reasonably predictable tax consequences'" of that transaction. *Id.* In the case *sub judice*, this concern has another dimension; the legislative policy underlying Subchapter K to give partners flexibility in structuring the tax consequences of their transactions would also be frustrated by adoption of a less stringent rule. To allow one taxpayer to later challenge the form of the agreement necessarily would endanger and perhaps ultimately defeat the reasonable expectations of the other party, who has proceeded taxwise under the parties' contract and agreement, as to the tax consequences flowing therefrom.

Nor would the other party to the contract be the only one adversely affected. Indeed, in the present case, the Commissioner strenuously emphasizes the potential under the Tax Court's approach for parties to "whipsaw" the Commissioner by assuming inconsistent tax positions. Indeed, precisely this situation exists here: whereas the continuing partners in the Bielstein-Spector partnership achieved their goal, which was evidenced by the parties' contract, of structuring the transaction as a section 736 liquidation so that they could avail themselves of the tax benefits flowing therefrom, taxpayer now asks this Court to sustain his delayed attempt to assume the opposite position, to the ultimate detriment of the public fisc.[11] Nor is taxpayer's assertion that the Commissioner has the means by which to protect himself in this situation wholly accurate: only by issuing protective notices of deficiency in virtually every case involving the withdrawal of a partner, and then proceeding against all of the parties to the transaction, would the Commissioner be able to minimize the possibility of being whipsawed. Moreover, as the Court recognized in *Sullivan v. United States*, 618 F.2d at 1004, "the prior law 'encourage[d] parties unjustifiably to risk litigation after consummation of a transaction in order to avoid the tax consequences of their agreements'" *quoting Danielson*, 378 F.2d at 775.

A related consideration is that, to the extent that the Tax Court's approach rewards a taxpayer's intentional misrepresentation to the Commissioner of the true nature of a transaction, it is not desirable from a policy standpoint. Inasmuch as our federal system of income taxation relies heavily upon individual taxpayers to report their income in an accurate and forthright manner, little, if anything, is to be gained by a rule that encourages just the opposite.

Perhaps most convincing is the absence of any compelling necessity for a test less stringent than that imposed under the *Danielson* approach. As noted *supra*, the principal justification for allowing taxpayers to escape the general rule that prevents unilateral attempts to dispute the form of their agreements is the prevention of unjust results. By allowing parties to challenge the form of an agreement upon showing a mistake, overreaching, duress or other reason which, in an action between the parties to

---

**11.** It does not appear in the record that, as against the continuing partners, the Commissioner ever challenged the transaction.

the transaction, would be sufficient to alter that construction or set it aside, the *Danielson* rule provides an appropriate balance between the interest of the Commissioner in the efficient and orderly administration of the tax laws and the need to ensure flexibility and fairness in individual cases. Although we need not, and do not, decide to what extent the approach adopted herein may be applicable in future cases involving contractual allocations in covenants not to compete, we are convinced that the *Danielson* rule is not inconsistent with the principles heretofore espoused by this Court in that area. This Court's admonition in *Winn-Dixie Montgomery, Inc. v. United States*, 444 F.2d at 682, is worth repeating:

> The whole trend of the law in this area is against binding the Revenue Service by ... a secret, unilateral, subjective allocation which is not carried over into the agreement.

 Moreover, we perceive no unfairness in allowing the Commissioner to challenge the form of a transaction as devoid of "economic reality," while placing limitations on taxpayers' ability to do the same. As the court emphasized in *Harvey Radio Laboratories, Inc. v. Commissioner*, 470 F.2d 118, 120 (1st Cir. 1972):

> While we do not agree that a taxpayer, to suit his convenience, can freely avoid the consequences of his agreement by showing that the "economic realities" were otherwise, we have no quarrel with those cases which accord such an option to the Commissioner. * * * The parties are free to make their own agreement. The Commissioner, on the other hand, has to deal with the apparent agreement he is faced with. It does not seem unfair that he should be less strictly bound to its bona fides that are the parties themselves.

(citations omitted).

Consequently, the decision of the Tax Court is reversed, and the case remanded for a determination of whether taxpayer has adduced proof of mistake, fraud, undue influence or any other ground that, in an action between the parties to the agreement, would be sufficient to set it aside or alter its construction. If the Tax Court determines that taxpayer has failed to adduce such proof, it may then consider the alternative argument raised by taxpayer, but not ruled upon below, *i. e.*, that although the payments were in liquidation of taxpayer's partnership interest, they were payments with respect to goodwill pursuant to a provision for such payments.

REVERSED AND REMANDED.