**In the Matter of J. C. INVESTMENTS, INC., Debtor.**

**J. C. INVESTMENTS, INC., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Bankruptcy No. 78–697.**

United States Bankruptcy Court, M. D. Florida, Tampa Division.

Oct. 16, 1981.

Don Stichter, Tampa Fla., for J. C. Investments.

Gary Betz, U. S. Atty., Tampa Fla., Richard F. Mitchell, Tax Div., U. S. Dept. of Justice, Washington D. C., for United States.

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ALEXANDER L. PASKAY, Chief Judge.

THIS IS a pre-Code arrangement proceeding, instituted by J. C. Investments, Inc. (JCI), a debtor who seeks rehabilitation under Chapter XI of the Bankruptcy Act of 1898. The matter in controversy is the extent of JCI's liability for federal income taxes for the tax year of 1971 and the years up to and including 1975. According to the proof of claim filed in the proceeding by the Internal Revenue Service (Service), JCI is indebted to the U.S. Government in the amount of $3,756,007.44. In due course, JCI filed an objection to the claim contending that the computation of income taxes by the Service is incorrect as a matter of fact and law and that JCI is not indebted to the U.S. Government in any amount.

Due to the complex nature of this controversy, the court directed the parties to treat

the matter as an adversary proceeding, to be governed by Part VII of the Bankruptcy Rules. After completion of extensive discovery by both sides, the matter was set down for trial and the record established at the final evidentiary hearing can be summarized as follows:

JCI is a Florida corporation formed in November, 1969, for the purpose of acquiring raw land, developing the same and selling it at retail on installment contracts, primarily to the residents of Puerto Rico where JCI maintains its principal place of business. The individuals who formed the corporation were Jaime Carlo and his brother, Miguel Carlo. The corporation selected its tax year and fiscal year ending August 31. Shortly after its formation, JCI embarked on a land acquisition program. The first acquisition involved the property known as Sunrise Acres located in Polk County, Florida. The tract contains 3,010 acres. The purchase price was $535 per acre or a total price of $1,600,000. The property was purchased on terms. Initially, JCI paid on the contract, $250,000 down which included $25,000 option price; a purchase money mortgage in the amount of $985,000 at a 6% annual interest. JCI also assumed an existing mortgage in the amount of $310,000.

The next property acquired by JCI in 1972 is known as Sunrise West. This tract contains 320 acres, also located in Polk County, Florida. The purchase price was $1,000 per acre or a total of $320,000. JCI paid $60,000 down, assumed two mortgages, one held by Federal Land Bank and the other by the previous owner, Mr. and Mrs. Fussell. The down payment on this purchase was obtained through a loan from one Miguel Ortiz in the amount of $40,000 and $20,000 from the cash flow of JCI generated through collections on the installment land sales.

The last property, known as Sunrise East, also located in Polk County, Florida, was acquired in September, 1973. It consists of 196 acres and was purchased at the price of $900 per acre or a total of $176,400. The down payment on this acquisition was obtained through a loan from one Mel Haber in the amount of $20,000 and JCI assumed a first and a second mortgage which already had encumbered Sunrise East.

JCI commenced its retail land sales in the fall of 1970 after having obtained an approval of its retail land sales program from Florida Land Sales Board. The properties were sold, as noted earlier, primarily to the residents of Puerto Rico through a wholly owned subsidiary of JCI, JC Properties, Inc. (Properties), which acted as a selling agent. The principals of Properties were the Carlo brothers. According to the commission arrangement, Properties was to receive 35% of the total price as a commission and was to receive 40% of the cash flow toward the payment of the commission. The brokers were to receive 25% of the gross sales price and 35% of the cash flow until the commission was paid in full. In turn, salesmen employed by the brokers were to receive a 15% commission including 9% out of the total 10% down payment and 25% out of the cash flow. The net effect of this arrangement was that JCI did not receive any money at all from the down payment on a completed land transaction and the bulk of the down payment and also early installment payments were to go to the salesmen and brokers.

JCI had no meaningful capitalization and was in dire need of funds from the very inception of its operation. Thus beginning 1971, JCI commenced very complex and highly unusual financing arrangements primarily with three Puerto Rican lending institutions: Banco Credito (Credito), Bank of San Juan (Bank) and Banco de Economias y Prestamos (Economias). The initial financing, not relevant to the matter under consideration, was with Economias and involved the purchase of Sunrise Acres.

On July 7, 1971, JCI signed a document entitled *"Agreement on the Purchase—Sale of Conditional Sales Contracts."* (Literal translation from Spanish). According to this agreement, (Joint Exh. # 7) Banco Credito would "purchase" from JCI installment land contracts under the following terms and conditions procured by Properties on behalf of JCI.

Banco Credito would pay JCI 50% of the unpaid contract balance and collect the contractual monthly payments directly from the land purchaser. However, the 50% which was to be paid to JCI was not, in fact, paid to JCI at all but was deposited in a bank account called a "reserve account" opened in the name of JCI, but totally controlled by Banco Credito and was considered by the parties as "collateral" for the advances (Joint Exh. # 7, ¶ F). Banco Credito had the option to refund to JCI any excess of 50% from this reserve account. The agreement further provided that in the event any of the land contracts fell in default to the extent of four months installment payments, JCI became obligated to pay the entire balance due under the contract to Banco Credito. While this agreement called for the execution of an assignment of the individual land contracts, there was, in fact, no assignment ever executed. This arrangement lasted until 1973 when Banco Credito decided not to advance any more funds against the land contracts in excess of $1 million which was ultimately repaid by JCI.

Next, largely as a temporary measure, JCI entered into an arrangement with Bank of San Juan on June 19, 1973. This transaction was cast in the form of a straight loan secured by the installment land contracts placed in escrow. There is no doubt that this was not a sale of the land contracts and the monies received under this arrangement were clearly loan proceeds and not proceeds of a sale of the land contracts. This arrangement was terminated when the outstanding loans reached $100,000.

In 1973, JCI entered into a new financing arrangement with Economias. Under this arrangement, JCI was to bring a prospective land purchaser to Economias who in turn would lend each land purchaser 50% of the unpaid balance on the contract. The balance of the loan proceeds, however, would not be turned over to the land purchaser but to JCI via a deposit in three different escrow accounts. The first escrow account was set up for the purpose of making payments on the Haber mortgage. Escrow # 2 was set up to make payments on the other mortgages and the third escrow account was set up to handle JCI's operational needs and also considered to be additional security for monies due from JCI to Economias and for payments of brokers commissions.

Sales of lots sharply declined due to the recession, lack of operating monies and the loss of brokers. Heavy financing charges continued without cash flow to meet these charges. Numerous complaints were filed with the Florida Land Sales Board which obtained a cease and desist order prohibiting JCI to sell any more lots. As JCI funds were exhausted, all the employees were released, with the exception of several office personnel and all operations by JCI came to a standstill.

An analysis of the financial statements of the company reflects that it was spending more than it received during the years in question and needed continual borrowing in order to survive and meet its obligations.

A recap based on the accrual method of reporting (Joint Exh. # 6) indicates that by adding an adjustment for bad debt reserve and unpaid commissions, JCI suffered net losses for the years in question in the following amounts:

| | |
|---|---|
| 1971 | $1,186,333 |
| 1972 | 263,168 |
| 1973 | 62,964 |
| 1974 | (610,366) |
| 1975 | (836,990) |
| | 65,109 |
| 1970 (NOL) | ———— |
| | (46,843) |

The recap just stated and the Plaintiff's Exhibit # 6 reveals net profit of only $65,-109 over the subject five-year period and this net income is more than offset by the net operating loss experienced in 1970 making an overall loss for the five-year period in the amount of $46,843.

The claim filed by the Service is challenged by JCI who contends that the assessment of taxes by the Service for the tax years in question was erroneous as a matter

of law and as a matter of fact. Particularly it is the contention of JCI that it was entitled to utilize the installment method of income reporting and even if not, it was entitled to deduct sales commissions conditionally earned, but not yet paid to brokers and salesmen, and deductions for bad debt reserve and lastly, the monies paid out by it on behalf of Properties.

In response to the objection interposed to the claim filed by the Service, the Service contends that JCI is not entitled to utilize the installment method of income reporting. First, because it received more than 30% in the tax years in question; and second, because JCI did not keep sufficiently adequate records which under the applicable regulations of the Commissioner is a prerequisite to the right to utilize the installment sale method of income accounting citing *Treasury Regulations on Income Tax* (1954 IRS Code) § 1.453–1(f), 26 CFR, § 1.453–1(f); see also *Revenue Ruling*, 54–111, 1954–1 C.B. 76; *Anderson v. Commissioner*, TC Memo 1956–178 (1956) aff'd 250 F.2d 242 (5th Cir. 1957).

In addition, the Service contends that even under the accrual method JCI improperly claimed a deduction for sales commissions because such obligation did not meet the so called "all-events test" and a deduction claimed by JCI for bad debt reserve was also improper because it was never set up in the tax year in question and in any event, never received the approval of the Commissioner. Lastly, the Service contends that the deduction claimed by JCI for expenses and deductions paid on behalf of Properties was improper.

■ Considering the issues presented by the respective contentions of the parties, seriatim, it should be stated at the outset that JCI concedes, as it must, that the Service is correct in its position that the determination by the Commissioner of the tax liability carries a presumption of validity. JCI contends, however, that a taxpayer should be permitted to overcome this presumption by presenting persuasive evidence that the determination of a tax liability by the Commissioner was in error as a matter of fact, a matter of law, or both. In this connection, JCI contends that it is entitled to present parol evidence to establish the true nature and character of the transactions under scrutiny and that it is not bound by documentation and the language used therein by the parties. The Service, of course, does not accept this proposition and urges that a taxpayer is bound by the form of its own transaction and should not be permitted by parole evidence or by expert testimony to establish that the transaction was something different than that which is stated on instruments executed by the parties, citing *Dixie Finance Co., Inc. v. United States*, 474 F.2d 501 (5th Cir. 1973); *Proulx v. United States*, 594 F.2d 832 (Ct.Cl.1979); *Spector v. Commissioner*, 641 F.2d 376 (5th Cir. 1981). All these cases involved agreements structured by the parties after careful consideration of the tax consequences and after intense negotiations conducted at arm's length. For instance, in *Spector v. Commissioner, supra*, the 5th Circuit held that just as the Commissioner in determining income tax liabilities may look through the form of a transaction to its substance, *Commissioner of Internal Revenue v. Court Holding Co.*, 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981 (1945); *Gregory v. Helvering*, 293 U.S. 465, 55 S.Ct. 82, 79 L.Ed. 645 (1935), so as a general rule, he may bind a taxpayer to the form in which the taxpayer has cast a transaction.

In *Spector, supra*, the agreement involved a sale of a partnership interest in an accounting firm and it is clear that the transaction was carefully structured by accountants for the express purpose of assuming a bargained for tax posture thereby allocating the tax consequences flowing therefrom in an agreed upon manner. In *Spector, supra*, the agreement was arrived at after extensive bargaining and intense negotiations. Under these circumstances, it is evident that the taxpayer should not, after the fact, be permitted to disregard the form of the transaction he has selected. As stated by the Court in *Spector, supra*, that while the taxpayer is free to organize his affairs as he chooses, nevertheless, once

having done so, he must accept the tax consequences of his choice and may not enjoy the benefit of some other route he might have chosen to follow but did not, citing *Higgins v. Smith*, 308 U.S. at 473, 60 S.Ct. 355, 84 L.Ed. 406 (1940).

On the other hand, there is a substantial body of authority to support the proposition that the courts will consider all facts which control the controversy and will not slavishly abide by the form of the agreement and disregard the substance of the transaction. Thus, there is a long line of decisions which hold that in determining tax liabilities, the tax authority must look through form and consider facts and substance of the transaction. *Helvering v. Tex-Penn Oil Co.*, 300 U.S. 481, 57 S.Ct. 569, 81 L.Ed. 755 (1936); *Eisner v. Macomber*, 252 U.S. 189, 40 S.Ct. 189, 64 L.Ed. 521 (1919); *Gregory v. Helvering, supra; W.S. Badcock Corp. v. C.I.R.*, 491 F.2d 1226 (5th Cir. 1974); *Orlando Orange Groves Co. v. Hale*, 119 Fla. 159, 161 So. 284, (1935); *Lawyer's Title Guaranty Fund v. United States*, 508 F.2d 1 (5th Cir. 1975).

In the present instance, it is clear that the agreements with the Banks were not arrived at after "intense negotiations" and there is no doubt that JCI was not in any way bargaining for a tax position as were the taxpayers involved in the cases cited by the Service. First of all, the transaction by JCI and the Bank of San Juan was even on its face a loan agreement secured by land contracts and was not a sale of the land contracts. This being the case, the monies received by JCI from the Bank of San Juan represented loan proceeds which were ultimately paid by JCI and cannot be characterized as income and taxed as such.

Next, while it is true that the transactions with Banco Credito and with Economias appear to be agreements to sell the land contracts, the surrounding facts and circumstances cast serious doubt that the agreements were, in fact, to sell and to purchase. JCI never executed an assignment of the land contracts; the Banks never made any efforts to collect the installment payments from the land purchasers; the Banks never conducted a credit check as to the credit worthiness of the land purchasers; and the transactions were absolutely and pervasively controlled by the Banks. Moreover, the obligations undertaken by the land purchasers were not enforceable either by JCI or by the Banks; the land contracts did not impose a personal liability on the land purchasers; the funds advanced by the Banks were secured by mortgages on the land holdings of JCI and guaranteed by the Carlo brothers. It needs no elaborate discussion to demonstrate that as a matter of sound commercial practice, in the case of an absolute sale of an installment contract, the buyer of the contracts would insist on an assignment of the contracts; would investigate the credit worthiness of the purchaser and would not be able to obtain any security since in the case of an absolute sale there is no obligation to be secured simply because there is no requirement to repay the purchase price paid except under exceptional circumstances when a transaction is nullified either by agreement of the parties or through judicially allowed rescission.

■ This being the case, this Court is satisfied that the monies received by JCI from the Banks represented merely proceeds of loans, albeit at times disguised as proceeds of sale of land contracts, thus, not taxable income in the respective tax years. This being the case, it follows that JCI not having received more than 30% from the land contracts sold in any of the tax years in question was entitled to utilize the installment method of income reporting pursuant to § 164 of the Internal Revenue Code of 1954, 26 U.S.C. § 164.

■ Even assuming, but not admitting that JCI did not qualify for the installment method of income reporting because it did not keep sufficient and accurate records which under the regulations of the Service is a condition precedent for utilization of installment method of income reporting, the computation on the accrual method of taxes by the Service is also not entirely correct. JCI deducted unearned commissions and bad debt reserve from its gross income dur-

ing the respective tax years. The Service disallowed both. The first on the ground that since the deduction for unearned commissions did not meet the "all-events test", therefore, it cannot be deducted; the second, on the ground that allowance for deduction for bad debt reserve is not a matter of right, but rests in the sound discretion of the Commissioner and since no allowance for deductions was granted, the deduction was improper.

JCI concedes, as it must, that as a general proposition the test for determining whether a liability may be accrued in a particular year for income tax purposes is the so-called "all-events test" which requires that before an item may be deducted in a given tax year all events necessary to determine both fact and amount of liability occurred. The corollary to this proposition is that as a general rule the existence of contingency in a taxable year with respect to liability or its enforcement for income tax purposes and deduction can only be claimed in a taxable year when the obligation to pay became conditionally fixed. *Putoma Corp. v. Commissioner*, 601 F.2d 734 (5th Cir. 1979) and *Burlington-Rock Island Railroad v. United States*, 321 F.2d 817 (5th Cir. 1963), *cert. den.*, 377 U.S. 942, 84 S.Ct. 1349, 12 L.Ed.2d 306 (1964); *United States v. Anderson*, 269 U.S. 422, 46 S.Ct. 131, 70 L.Ed. 347 (1926). All of these cases involved a liability which was conditioned upon the future financial position of the taxpayer. For instance, in *Burlington-Rock, supra*, the railroad's liability to pay interest was tied to its cash situation and the railroad was not required to make payments if its cash position did not reasonably permit the payment. The obligation to make payment of compensation to officers in *Putoma, supra* was equally tied to the financial ability of the corporation and was not due until the company accumulated sufficient cash reserves to pay the additional salary.

■ The only possible contingency on the liability of JCI to pay commission was the commercial risk of non-collection on the installment land contract from the purchasers. Considering a similar situation, the Fifth Circuit Court of Appeals in *Badcock, supra* and *Lawyer's Title Guaranty Fund, supra; Gillis v. United States*, 402 F.2d 501 (5th Cir. 1968), held that this possible contingency would not necessarily destroy the applicability of the "all-events test."

Based on the foregoing, this Court is satisfied that the disallowance of the deduction for commissions yet to be paid was in error as a matter of law.

■ However, this is not the case with regard to the disallowance of the bad debt reserve. As noted earlier, a taxpayer is not entitled to such a deduction as a matter of law and it is in the sound discretion of the Commissioner to permit the deduction. This being the case, since the Commissioner in this instance did not allow the deduction the disallowance was proper.

This leaves for consideration the last item in issue which is the propriety of claiming a deduction for monies paid by JCI on behalf of Properties.

■ In the tax year of 1975, JCI paid and claimed a deduction in the sum of $489,109 to Properties. Section 162 of the Internal Revenue Code permits a deduction for ordinary and necessary business expenses, but assumption of expenses of a subsidiary is not deemed to be an ordinary and necessary business expense and cannot be deducted unless the taxpayer has a legal obligation for the debt. *Deputy v. Dupont*, 308 U.S. 488, 60 S.Ct. 363, 84 L.Ed. 416 (1940); *Zoby v. United States*, 364 F.2d 216 (4th Cir. 1966).

The record reveals that it was not a formal, but a de facto merger between JCI and Properties in 1975. The accounting between the two corporations was at least "cloudy" and there is no adequate contemporaneous characterization of these payments which were characterized on a Statement of Changes for the Year Ended August 31, 1975 (Debtor's Exh. # 5). The "Advances" absorbed by the subsidiary and the characterization of this transaction as an advance was, in reality, just another way to describe a loan and, of course, lending

money is not a deductible expense. The claim of JCI that the payment of $489,109 was actually payment for commissions earned by Properties is an after the fact attempt to justify this deduction. JCI, on its return, had already deducted $757,352 for commissions (Joint Exh. # 6) and the proposition that annual commissions in the total amount sales of $1,246,461 is hard to believe.

This being the case, this Court is satisfied that the deductions of $489,109 was improper and the Service was correct.

A separate order allowing the readjusted amount should be submitted on notice by the Service.