IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 94-50291

_____

IN THE MATTER OF:  INSILCO CORPORATION,

                                    Debtor.

INSILCO CORPORATION,

                                    Appellant,

                    versus

UNITED STATES OF AMERICA and
AMPHENOL CORPORATION,

                                    Appellees.

_____

Appeal from the United States District Court
for the Western District of Texas

_____

(May 15, 1995)

Before HIGGINBOTHAM, SMITH, and STEWART, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

During the pendency of its voluntary bankruptcy proceedings, Insilco Corporation filed an amended return with the Internal Revenue Service, claiming a $14.4 million refund. The bankruptcy court adjudicated Insilco's claim and granted summary judgment in favor of the government. Insilco appealed, and the district court affirmed. We hold that Insilco is not entitled to a refund and, accordingly, affirm.

In 1985, Insilco Corporation owned sixty-six percent of the shares of Times Fiber Communication, Inc. and the public owned the remainder. LPL Investment Group, Inc.,[1] a newly formed corporation with no significant assets, sought to acquire Times Fiber. LPL initially proposed to pay Insilco cash and LPL stock in exchange for Insilco's Times Fiber stock. Later, the parties structured the deal as the following individual transactions rather than a single exchange:

> 1. <u>Public Offer</u>: Times Fiber made a self-tender to purchase the Times Fiber shares held by the public for $15.25 per share.

> 2. <u>Times Fiber Sale</u>: Insilco sold all of its Times Fiber shares to LPL in exchange for $15.25 per share, or approximately $96 million in cash.

> 3. <u>LPL Preferred Stock Purchase</u>: Insilco paid $20 million to LPL to purchase 200,000 shares of LPL preferred stock.

> 4. <u>LPL Common Stock Purchase</u>: Insilco and five other investors paid $8 million to acquire LPL common stock. Insilco paid $897,068 for 953,135 shares of class A stock.

> 5. <u>Merger</u>: LPL acquired the remaining shares of Times Fiber stock held by the public for $15.25 per share by means of a merger.

A separate document was prepared for each of these transactions: for the public offer, an Offer to Purchase for Cash by Times Fiber Communications, Inc. Any and All Outstanding Shares of its Common Stock, dated December 4, 1985; for Insilco's sale of Times Fiber Stock to LPL, a Stock Purchase Agreement, dated November 17, 1985 and amended December 2, 1985; for Insilco's purchase of LPL

---

[1]    LPL is the predecessor corporation to the current intervenor-appellee, Amphenol Corporation.

preferred stock, a Preferred Stock Subscription Agreement, dated December 31, 1985; for purchase of LPL common stock by Insilco and other investors, six Common Stock Subscription Agreements, each dated December 31, 1985; and for the merger of the remaining Times Fiber shares of stock held by the public, an Agreement and Plan of Merger, dated November 22, 1985. The public offer expired on December 26, 1985, and the other transactions closed on December 31, 1985. In 1989, LPL redeemed all of Insilco's LPL stock, both common and preferred.

On its original 1985 tax return, Insilco reported that it sold the Times Fiber stock for $96 million, recognizing a gain of approximately $75 million from a basis of $21 million. It also treated the LPL preferred and common stock as purchased for $20 million and $897,068, respectively. LPL reported the Times Fiber stock as a purchase for cash and elected to have I.R.C. § 338[2] apply to the transaction.

Availability of the § 338 election was critical to the success of the negotiations between LPL and Insilco. Under § 338, a corporation that purchases eighty percent of the stock of another corporation within a twelve-month period and satisfies certain other conditions may elect to have the transaction treated as though it were a purchase of the assets (rather than the stock) of the acquired corporation, thus allowing the basis of those assets to be stepped up to the amount paid for the stock. This, in turn,

---

[2] All citations to the Internal Revenue Code are as of 1985, when the events relevant to the issues in this case took place.

3

has the effect of increasing the amount of the depreciation or amortization deductions available to the acquired corporation, and, accordingly, its post-tax cash flow. Lawrence DeGeorge, chief executive officer of LPL, stated in his affidavit that he would not have pursued the transaction had he believed that an election under § 338 would not be available. Insilco was aware that LPL intended to make and did actually make the § 338 election.

In 1991, during the pendency of its voluntary bankruptcy proceedings, Insilco amended its 1985 federal income tax return and claimed a refund of approximately $14.4 million. In the amended return, Insilco took the position that under substance-over-form principles, the transaction should be treated as an exchange of Times Fiber stock for cash and LPL stock. In effect, Insilco sought to collapse the separate purchase and sale transactions into the following single transaction: Insilco sold all of its stock in Times Fiber and in exchange received LPL common and preferred stock and approximately $75 million in cash ($96 million for the sale of Times Fiber stock <less> $20 million for the purchase of the preferred shares <less> $897,068 for the purchase of the common shares). By characterizing the transaction in this manner, Insilco would be entitled to a refund under §§ 304 and 351 and LPL would not be entitled to the § 338 election.

A few days after filing its amended return, Insilco sought adjudication of its refund claim in the bankruptcy court. Insilco and the government each filed a motion for summary judgment. The bankruptcy court denied Insilco's motion and granted summary

4

judgment in favor of the government. The district court affirmed. Insilco filed an appeal in this court, which was dismissed when the court determined that the order from which the appeal was taken was not an appealable final order. The case was remanded to the bankruptcy court, which disposed of the remaining issues between the parties. The district court essentially re-entered its judgment affirming the summary judgment decision, and Insilco filed this appeal.

## II.

### A.

The bankruptcy court correctly held that the rule of Commissioner v. Danielson, 378 F.2d 771 (3d Cir.) (en banc), cert. denied, 389 U.S. 858 (1967) (adopted by this court in Spector v. Commissioner, 641 F.2d 376 (5th Cir. Unit A), cert. denied, 454 U.S. 868 (1981)), applies to preclude Insilco from recharacterizing its transaction and reaping favorable tax benefits. In Danielson, shareholders of the Butler County Loan Company sold their interest in the company to the Thrift Investment Corporation. Each shareholder received $374 per share, which was allocated $222 to the share and $152 to a covenant not to compete. Under applicable tax laws, such allocation would mean that the $222 would be entitled to favorable capital gains treatment while the $152 had to be treated as ordinary income. When the shareholders claimed the full amount as capital gain, the IRS filed suit for the deficiency.

5

The court found in favor of the IRS and adopted the following rule: "[A] party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc." 378 F.2d at 775. The court distinguished the case in which the taxpayer seeks to raise a substance-over-form argument from cases in which the IRS resorts to such argument. The court found that "to allow the Commissioner alone to pierce formal arrangements does not involve any disparity of treatment because taxpayers have it within their own control to choose in the first place whatever arrangements they care to make." Id.; accord Spector, 641 F.2d at 381 ("Just as the Commissioner in determining income tax liabilities may look through the form of a transaction to its substance, so, as a general rule, may he bind a taxpayer to the form in which the taxpayer has cast a transaction.") (citations omitted). The court also addressed the issue of taxpayers who, claiming to be unaware of the tax consequences of their agreement, argue that they could not have consciously entered into the agreement. The court held that even when "'[i]t is reasonably clear that the sellers failed to give consideration to the tax consequences of the provision, . . . where parties enter into an agreement with a clear understanding of its substance and content, they cannot be heard to say later that they overlooked possible tax

6

consequences.'" Danielson, 378 F.2d at 778 (quoting Hamlin's Trust v. Commissioner, 209 F.2d 761, 765 (10th Cir. 1954)).

Finally, the court raised sound policy reasons to hold parties to their agreements. First, it noted that the tax consequences of a transaction are often taken into account in determining the purchase price. Danielson, 378 F.2d at 775. To allow one party to recharacterize a transaction at a later date to achieve favorable tax advantages would be tantamount to granting that party "a unilateral reformation of the contract with a resulting unjust enrichment." Id. Second, the court concluded that sanctioning such recharacterization would "nullify the reasonably predictable tax consequences of the agreement." Id. Third, the court found that to permit this type of attack "would cause the Commissioner considerable problems in the collection of taxes[, because] [t]he Commissioner would not be able to accept taxpayers' agreements at face value." Id.

This court faced a similar recharacterization issue in Spector. There the court had to determine "whether a transaction in which taxpayer surrendered his partnership interest in an accounting firm in exchange for a specified sum constitutes a 'sale' of his partnership interest, thus creating long term capital gain under [I.R.C. §] 741 . . ., or whether the transaction was a 'liquidation' of taxpayer's interest under section 707(c), thus producing ordinary income gain under section 736(a)(2)." 641 F.2d at 377-78. The parties to the transaction had structured it as a liquidation, and the evidence revealed that the amount of the

7

withdrawing partner's settlement was calculated with the expectation that the parties would elect to treat the transaction as a liquidation.  Reviewing the taxpayer's decision to treat the transaction as a sale producing a capital gain, the Tax Court concluded that the taxpayer could disavow the form of the transaction on a showing that, as structured, it did not comport with economic reality.  This court, however, adopted the Danielson rule and reversed and remanded.  Id. at 386.

Utley v. Commissioner, 906 F.2d 1033 (5th Cir. 1990) (per curiam), reached the same result.  In that case, the taxpayers sold property to a corporation in which they were the sole shareholders. As an installment sale, the taxpayers were required to report capital gains.   However, had the parties characterized the transaction as a contribution to capital, the transfer would have been a non-recognition event under I.R.C. § 351.   This court rejected the taxpayers' attempt to claim that the transfer was not really a sale but a contribution and concluded that despite the lack of evidence indicating that the transaction was in reality an installment sale, the taxpayers were held to the form of transaction originally chosen.  Id. at 1038-39.

Danielson, Spector, and Utley stand for the proposition that a taxpayer cannot recast its transaction and reap the resulting benefits.  This principle and the policies that underlie it apply in this case.  Insilco could have structured the transaction as a sale of stock in exchange for cash and stock; indeed, that is how the parties originally structured the transaction.  Nonetheless,

8

the parties ultimately chose to structure the transaction as separate purchases and sales. Some six years later, now that it has no remaining financial interest in LPL, Insilco cannot change its mind. LPL anticipated that § 338 would apply to step up the basis in Times Fiber's assets. To allow recharacterization would effectively permit Insilco to unilaterally reform the contract, contrary to the teachings of Danielson.

B.

Insilco argues that the Danielson rule does not apply in this case because §§ 304 and 351 are mandatory. In other words, Insilco claims that it made a mistake of law that it is now seeking to correct and that it is not seeking to recast the facts of its transaction. This argument is without merit.

1.

Section 304 provides that when a person who is in control of two corporations sells the stock of one corporation to the other corporation, the proceeds of the sale shall be considered a distribution and the acquired stock shall be considered a contribution to capital. In order for § 304 to apply, the transferor (Insilco) must be in control of both corporations (Times Fiber and LPL) before the stock transfer. See Treas. Reg. § 1.304-2(a). Insilco was in control of Times Fiber before the transfer. See I.R.C. § 304(c)(1). It argues that it also had actual control of LPL before the transfer pursuant to § 304(c)(2)(A), which provides that

> [w]here 1 or more persons in control of the issuing corporation [Times Fiber] transfer stock of such corporation

9

> in exchange for stock of the acquiring corporation [LPL], the stock of the acquiring corporation received shall be taken into account in determining whether such person or persons are in control of the acquiring corporation.

As LPL and Insilco structured the transaction, Insilco received $96 million when it transferred the Times Fiber stock to LPL; it did not receive any LPL stock. Nor did Insilco acquire LPL shares of stock by transferring its shares of Times Fiber. In short, the transaction was structured as purchases and sales of stock for cash, not as an exchange of stock for stock. To achieve a result that fits within § 304 requires that we recharacterize the transaction, which is precluded by Danielson.

Insilco attempts to avoid recharacterization arguments by claiming that it had constructive ownership of LPL before the transactions. A person constructively owns stock if that person has an option to acquire the stock. I.R.C. § 318(a)(4). "[T]o qualify as an option, the holder must have the right to obtain the stock at his election. . . . [with] no contingencies with respect to such election." Rev. Rul. 68-601, 1968-2 C.B. 124 (defining when a warrant is an option). Insilco claims that it had an option to purchase a controlling portion of LPL stock because on December 31, 1985, it had the unconditional right to acquire one hundred percent of the LPL preferred stock, the aggregate value of which represented over fifty percent of the total value of all classes of LPL stock.

Insilco did not make this argument to the bankruptcy court, and we need not consider it. Insilco claims its failure to make the specific constructive ownership argument to the bankruptcy

court should not preclude this court from considering the issue because it has always maintained that § 304 applied and § 304(c) refers to § 318, the constructive ownership provision. However, Insilco had to advance its option argument before the bankruptcy court. Instead, the first time Insilco raised this argument was in its reply brief to the district court on appeal from the bankruptcy court's order. The district court did not mention the issue in its affirmance, and we need not consider issues raised for the first time on appeal. See First Colonial Corp. of Am. v. American Benefit Life Ins. Co. (In re First Colonial Corp. of Am.), 693 F.2d 447, 449-50 n.5 (5th Cir. 1982), cert. denied, 461 U.S. 915 (1983); see also Texas v. United States, 730 F.2d 339, 358 n.35 (5th Cir.) (stating that the determination of whether to consider an issue not raised below is within the discretion of the court and should be decided on a case-by-case basis), cert. denied, 469 U.S. 892 (1984). In any event, the contract to purchase the preferred shares cannot be considered an unconditional option because Insilco's agreement to purchase $20 million worth of LPL preferred shares was conditioned on other transactions, most notably Insilco's agreement to sell its Times Fiber shares to LPL and the merger of Times Fiber into LPL.

2.

Insilco also argues that § 351 is mandatory and, therefore, applicable to the LPL transaction. Section 351(a) provides that "[n]o gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for

11

stock or securities in such corporation and immediately after the exchange such person or persons are in control . . . of the corporation."   As with § 304, Insilco's argument hinges on its characterization of the transaction as an exchange of Times Fiber stock for LPL stock and cash.   While surely related, the distinct transactions involving Insilco, LPL, Times Fiber's shareholders, and other investors were simply not structured as an exchange. Insilco's attempt to say otherwise is not permitted.   See Danielson, 378 F.2d at 775.

## III.

For the foregoing reasons, the judgment of the district court is AFFIRMED.