**NATIONAL AUSTRALIA BANK, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 99–690C.

United States Court of Federal Claims.

Dec. 29, 2004.

Paul Martin Wolff, Ryan T. Scarborough, and Willis N. Sautter Washington, D.C., for plaintiff.

Brian L. Owsley and Jeanne E. Davidson, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, for defendant. With them on the briefs were Scott D. Austin, Glenn I. Chernigoff, Paul G. Freebourne, Jeffery T. Infelise, and Brian A. Mizoguchi.

## OPINION

BRUGGINK, Judge.

Pending in this *Winstar*-related [1] tax benefit case are plaintiff's motion for summary judgment and defendant's cross-motion for summary judgment. In a prior opinion, *National Australia Bank v. United States,* 55 Fed.Cl. 782 (2003), we ruled that the government's action—the retroactive elimination of the deduction for covered-asset losses through the passage of the Guarini legislation in 1993 [2]—breached the covenant of good faith and fair dealing implied in its express contract with Michigan National Corporation ("MNC"), plaintiff's predecessor in interest.[3]

In dispute is the proper damage award, if any, due plaintiff. Plaintiff's motion asks the court to find that, because of the Guarini legislation, it was not permitted to deduct $103,155,357 in covered-asset losses on its tax returns and, as a result, paid an additional $36,135,373 in taxes it would not have otherwise paid. It asks that it be awarded 75% of that amount, or $27,101,530, which it argues is its share of the tax benefits under the agreement.

In its cross-motion, defendant asks the court to deny plaintiff's claim for damages altogether because plaintiff cannot establish the tax basis of any of the specific covered assets that are the foundation of its claim. Alternatively, defendant argues that plaintiff's calculations overstate the correct amount, and that a genuine issue of fact exists to make summary judgment inappropriate. Finally, defendant asks the court to rule that, as a matter of law, plaintiff is entitled under the agreement to only 50% of any lost tax benefits and that any award should be adjusted accordingly. The matter

1. *United States v. Winstar Corp.,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

2. Omnibus Budget Reconciliation Act of 1993, Pub.L. 103–66, § 13224, 107 Stat. 312, 485 (1993) ("Guarini legislation").

3. We reached the same conclusion in similar cases. *Local Am. Bank of Tulsa v. United States,* 52 Fed.Cl. 184 (2002); *First Nationwide Bank v. United States,* 49 Fed.Cl. 750 (2001); *Centex Corp. v. United States,* 49 Fed.Cl. 691 (2001).

has been fully briefed. Oral argument was held on December 9, 2004. For the reasons set out below, we grant plaintiff's motion for summary judgment. Defendant's motion is denied.

## BACKGROUND

The background facts giving rise to this litigation can be found in our earlier decisions. *Id.* (finding that the enactment of the Guarini legislation was a breach of the implied covenant of good faith and fair dealing); *Nat'l Austl. Bank v. United States,* 54 Fed. Cl. 238 (2002) (finding that National Australia Bank had standing to bring breach claim). Familiarity with those facts is assumed. Consequently, only a brief summary of the background follows.

MNC entered into an agreement ("Assistance Agreement") with the Federal Savings & Loan Insurance Corporation ("FSLIC") to acquire a failing thrift, Beverly Hills Savings & Loan ("Beverly Hills"),[4] on December 31, 1988. Under the express terms of the Assistance Agreement, FSLIC was to reimburse MNC for certain covered-asset losses. Under applicable tax law, the reimbursements for covered-asset losses would not be includable in MNC's taxable income, and MNC could deduct those losses from its taxable income. These factors were important, bargained-for elements of the Assistance Agreement.

"Covered Asset" was defined in section 1(q) of the Assistance Agreement. It generally included all assets on the books of Beverly Hills at the time of acquisition. The Assistance Agreement also provided that reimbursement of covered-asset losses would be determined by subtracting the proceeds of its disposition, or the amount of any write down directed or approved by FSLIC, from the book basis of that asset. The parties

accounted for these covered-asset losses in a Special Reserve Account ("SRA") maintained by Beverly Hills. Unlike FSLIC reimbursements of covered-asset losses, taxable gains or losses on covered assets were computed as the difference between the proceeds received upon disposition or sale of an asset and the tax basis of that asset. Thus, an asset's tax basis is the starting point for computing taxable gain or loss at the time of the asset's disposition.

In connection with the acquisition, MNC attempted repeatedly to determine the pre-acquisition tax basis of the failing thrift's covered assets. This was made difficult by the condition of Beverly Hills's records, which have been described as a "mess." Prior to acquisition, MNC engaged Deloitte, Haskins, & Sells ("Deloitte") to review the tax returns and financial statements of Beverly Hills. On December 28, 1988, Deloitte informed MNC that, for the 1984 to 1987 period, Beverly Hills reflected losses of $1.1 billion on its financial statements but only reported tax losses of approximately $750 million on its tax returns. Based on those figures, Deloitte concluded that, by the end of 1987, the aggregate tax basis of covered assets exceeded the aggregate book basis by over $350 million.[5]

Shortly after acquisition, MNC again sought review of the pre-acquisition tax returns of Beverly Hills. MNC selected the firm of Coopers & Lybrand ("Coopers"), which had previously delivered tax services to Beverly Hills when it was under FSLIC control. The Coopers review concluded that Beverly Hills's pre-acquisition aggregate tax basis exceeded its aggregate book basis by over $210 million.[6] An asset-by-asset list of the tax basis of each covered asset was not located by either firm. Based on the two

---

4. The thrift changed names several times after acquisition. Of these, only the following names are relevant to this opinion: Beverly Hills, Michigan Bank, F.S.B., and Independence One. The name changes are not material to the disposition of this case.

5. Defendant disputes these facts. It argues the analysis was not on an asset-by-asset basis and was therefore insufficient to prove damages. Whether plaintiff must prove tax basis on an

asset-by-asset basis is a legal question. We find defendant's response fails to identify a dispute over a material issue of fact.

6. Defendant points out that the figure is based on an aggregate book and tax basis as opposed to an asset-by-asset analysis. MNC does not claim that Coopers prepared its report using an asset-by-asset analysis, however. Thus, defendant fails to identify a disputed issue of material fact.

reviews, MNC took the position in its tax returns for 1989, 1990, and 1991 that the pre-acquisition tax basis of covered assets was at least equivalent to their book basis.

The Assistance Agreement required MNC to maximize the tax benefits for covered-asset losses because those benefits were shared with FSLIC. Section 9(f) of the Assistance Agreement addressed the appropriate tax benefit sharing ratio:

> *Applicable Percentage.* For each fiscal year as of the beginning of which the Net Investment Account of the ACQUIRER is greater than zero, the Applicable Percentage shall be twenty-five percent (25%). For each fiscal year as of the beginning of which the Net Investment Amount of the ACQUIRER is equal to or less than zero, the Applicable Percentage shall be fifty percent (50%).

While the Assistance Agreement contemplated that the 50% tax-sharing ratio would be triggered at some point, the formula in section 1(kk) of the Assistance Agreement was drafted in such a way that the sharing rate would never reach 50/50 because the balance of the Net Investment Account, in practice, would never reach zero.[7] Therefore, FSLIC, and later its successor agency the Federal Deposit Insurance Corporation ("FDIC"), received only 25% of the tax benefits enjoyed by MNC until the Guarini legislation was enacted in 1993.

For every year from 1989 until 1994, when the Assistance Agreement was terminated, first FSLIC and then FDIC audited MNC to ensure it was maximizing the tax benefits for covered-asset losses.[8] The IRS, which also audited MNC during this period, did not question the deduction of covered-asset losses until after the passage of the Guarini legislation, when tax deductions for reimbursed covered-asset losses were retroactively eliminated.

The Assistance Agreement was subsequently terminated by a second agreement ("Termination Agreement") on September 29, 1994. According to its recital, the Termination Agreement provided for the following: (1) early termination of the Assistance Agreement; (2) "settlement of certain disputes under the Assistance Agreement"; and (3) prepayment of a promissory note issued by FDIC. Section 9.2 of the Termination Agreement expressly reserved to MNC the right to file a claim arising out of the enactment of the Guarini legislation. The parties dispute whether the Termination Agreement addresses the proper tax-sharing ratio for tax benefits obtained through this litigation.

MNC and Michigan Bank, F.S.B. were the original plaintiffs in this action. At the outset of this litigation they were wholly owned subsidiaries of National Australia Bank ("NAB"). On March 30, 2001, NAB declared a dividend-in-kind, which resulted in the sale of MNC and Michigan Bank, F.S.B. to ABN AMRO North America, Inc. In the sale, NAB retained the rights to this litigation. Consequently, NAB was substituted as plaintiff under Rule 25(c). *Nat'l Austl. Bank,* 54 Fed.Cl. at 238.

## DISCUSSION

■ Expectation damages are recoverable provided they are "actually foreseen or reasonably foreseeable, are caused by the breach of the promisor, and are proved with reasonable certainty." *Bluebonnet Sav. Bank, F.S.B. v. United States,* 266 F.3d 1348, 1355 (Fed.Cir.2001). In attempting to meet this standard, plaintiff relies mainly on the report of its expert witness, S.T.R. Revell, III. Mr. Revell has been a CPA since 1974 and was a partner at the accounting firm of Ernst & Young until his retirement in 2001. Mr. Revell used the "with and without approach" approved by this court in similar *"Winstar* tax" cases. *See First Heights*

---

7. The formula added MNC's aggregate capital contributions every year rather than only the year in which they were made. For example, if MNC contributed $60 million in 1989, $24 million in 1990, and nothing thereafter, the total capital contributions included in the calculation would have been $84 million. The formula, as written, added $60 million in 1989, $84 million in 1990, and $84 million each year thereafter,

rather than $60 million in 1989, $24 million in 1990, and nothing thereafter.

8. FDIC continued to audit MNC up to 1994 because, although it applied retroactively, the Guarini legislation was not passed into law until 1993.

Bank, F.S.B. v. United States, 57 Fed.Cl. 162 (2003); Centex Corp. v. United States, 55 Fed.Cl. 381 (2003). The "with" amount represents the reduced federal income taxes MNC would have incurred with the deductions in place, assuming the Guarini legislation had not been enacted. The "without" amount represents the actual federal income taxes paid by MNC as last reported to the IRS.

■ Mr. Revell traced the covered-asset losses through the quarterly reports of the Special Reserve Account ("SRA") and "mark-to-market" write downs performed by Morgan Stanley in 1992 and 1993, which did not run through the SRA.[9] He determined that $54,377,387 of the disallowed covered-asset losses were debited to the SRA[10] and that $48,77,970 of disallowed losses were incurred in the mark-to-market process for a total of $103,155,357 in lost deductions.

### Book/Tax Differences

The primary dispute between the parties relates to the reliability of Mr. Revell's report insofar as it attempts to project the tax deductions plaintiff lost because of the Guarini legislation. That dispute, in turn, primarily involves the reliability of his projections from the books and records of the bank acquired by plaintiff's predecessor in interest. Typically a claim of deduction, at least in the context of a tax return, is based on the

particular accounting history of the asset on which the loss is claimed. Here, however, it is undisputed that Beverly Hills's records did not permit a detailed asset-by-asset analysis of the tax basis of the covered assets for the years prior to MNC's acquisition. Such record keeping was only possible after December 31, 1989, the date MNC acquired Beverly Hills and the Assistance Agreement came into existence. As a result, Mr. Revell had to seek an alternative means to determine the tax basis of Beverly Hills's covered assets prior to its acquisition

Mr. Revell looked first at schedules attached to Beverly Hills's tax returns from 1980 to 1983. Beverly Hills used the reserve method of accounting for bad debts and was required to establish and maintain a reserve for losses on qualifying real property loans, a reserve for losses on nonqualifying loans, and a supplemental reserve for loans. From 1980 to 1983 Beverly Hills maintained those reserves and attached a schedule to its tax returns showing the activity in those accounts. These tax schedules showed no net charge-offs. Mr. Revell thus concluded that, as of December 31, 1983, the tax basis in assets giving rise to covered-asset losses were not less than the book basis of those assets.[11]

To analyze the pre-acquisition years from 1983 forward, Mr. Revell turned to MNC's 1989 tax workpapers, which included a sched-

**9.** These mark-to-market write downs were the result of the Assistance Agreement, which originally contemplated a two-year window for covered-asset-loss reimbursement, after which all remaining covered assets were marked-to-market. FSLIC paid Beverly Hills directly an amount equal to the mark-to-market write downs. After the initial two-year period was extended to four years, both parties retained Morgan Stanley to evaluate the remaining covered assets. By mutual agreement, its valuations were unreviewable. The mark-to-market write downs were covered-asset losses subject to disallowance by the Guarini legislation.

**10.** In arriving at this figure, Mr. Revell's report states that the SRA quarterly reports show that FSLIC approved $188,568,252 of covered-asset losses. In addition, they showed that a $3,348,869 covered-asset loss was permitted in the Termination Agreement, bringing the total to $191,917,121. However, of these, $34,639,417 were not disallowed by the enactment of the

Guarini legislation. Additionally, $102,730,877 of these covered-asset losses were approved by FSLIC prior to the March 4, 1991, effective date of the Guarini legislation and were deducted from the original figure. Mr. Revell adjusted the remaining figure slightly by eliminating duplications found in multiple quarterly reports as a result of the resubmission of previously disallowed covered-asset losses.

**11.** Defendant argues that these facts are misleading because they overstate "the implications of the analysis, which are in the aggregate as opposed to an asset by asset [sic] analysis." It points out that, if the book basis of assets exceeded the tax basis of those assets before 1980, book basis would still be higher than tax basis. Such a claim is tantamount to its earlier argument that such an aggregate analysis is insufficient to prove damages. Whether plaintiff must prove the tax basis on an asset-by-asset basis is a legal question. Defendant's response fails to identify a disputed issue of material fact.

ule reconciling the activity in the reserves listed above from December 31, 1983, to December 31, 1988. These tax workpapers also included a separate analysis of the book loan loss reserve for the same five-year period.[12] After comparing these schedules, Mr. Revell concluded that the net charge-offs reflected on the tax reserve reconciliation schedule and the book reserve analysis were identical, indicating no difference between book and tax basis on the loans charged off.[13]

As a result of his analysis, Mr. Revell concluded that the tax basis of the assets acquired by MNC was not materially less than book basis as reflected in the Initial Audit conducted by KPMG.[14] Thus, he could be confident that, in the aggregate, the tax basis of the covered assets was at least equal to book basis. Based on Mr. Revell's analysis, plaintiff asks this court to award it $27,101,530 in damages. It claims that the Guarini legislation directly caused MNC to lose $103,155,357 in covered-asset loss deductions, which, in turn, directly led to the payment of $36,135,373 in additional federal income taxes. It concedes that the $36,135,373 figure should be reduced by 25% because, under the tax-sharing provision of the Assistance Agreement, it was entitled to retain only 75% of that amount, or $27,101,530.

Defendant does not offer a competing figure. Instead it challenges the legal sufficiency of plaintiff's method of using aggregate numbers to prove that the tax basis of the covered assets was at least equal to their book basis. Defendant contends that, because plaintiff cannot produce an asset-by-asset list of each covered asset's tax basis, its damages model is not proved to a reasonable certainty and plaintiff should receive nothing.

In support of its argument, defendant presents the report of its expert, Dr. Merle Erickson. Dr. Erickson has been a CPA since 1990 and teaches accounting at the University of Chicago. Dr. Erickson claims that plaintiff's figures are unreliable. He points out that there was never a list denoting the tax basis of each covered asset at the date of acquisition; that there was not a comprehensive set of work papers memorializing plaintiff's analysis; and that it failed to use the alleged surplus in tax basis to claim further tax deductions prior to the Guarini legislation.

We can treat the three premises of Dr. Erickson's conclusions as correct for purposes of ruling on the motions. They are nevertheless not enough to raise a genuine issue of material fact. Plaintiff concedes, as it must, that the state of Beverly Hills's books and records was less than desirable. The question is whether, given their condition, plaintiff's proof of damages is fatally flawed. It is worth repeating that defendant does not offer a damage figure of its own. Its argument is simply this—*no* calculation based on aggregate figures can satisfy the required legal standard. We disagree.

Neither party is able to point to any law directly speaking to the issue of whether a taxpayer bank may use an aggregate figure to determine tax basis in connection with a loss deduction.[15] Defendant points to this court's decision in *Centex*, another *Winstar* tax case, for the proposition that this court requires that a plaintiff establish the tax basis of each and every covered asset that is part of its damages claim in order to meet its burden of proof. 55 Fed.Cl. at 384. While it is true that the bank in *Centex* possessed a "master list" of the pre-acquisition tax basis of individual covered assets, defendant overestimates the significance of that fact. While

---

12. Defendant disputes the facts in the two preceding sentences on the same grounds. *See supra* note 11. It challenges neither the schedules' existence nor Mr. Revell's use of them in his analysis, however. For the same reasons, we find defendant's response fails to identify a disputed issue of material fact.

13. Defendant disputes this fact on the same basis as previous responses. *See supra* note 11. For the same reason, we find defendant's response fails to identify a disputed issue of material fact.

14. The KMPG Initial Audit was conducted on behalf of both MNC and FSLIC in order to ascertain Beverly Hills's assets at the time of acquisition and their book value. These assets included both covered and noncovered assets.

15. See generally our decision in *Centex Corp. v. United States,* 48 Fed.Cl. 625, 632–36 (2001), in which we discuss the general and bank-specific tax provisions that control the deductibility of covered-asset losses.

such a list was certainly helpful, we did not hold that a breach of contract claim fails in the absence of such proof. The law merely requires proof with reasonable certainty.

In the absence of any clear precedent, defendant points, in the alternative, to IRS policy, which it suggests should guide the court. To that end, it offers the affidavit of Ricky Manikowski, an IRS employee and former IRS agent, who states that it is the policy of the IRS to use a zero tax basis if the taxpayer does not know the tax basis of an asset. Mr. Manikowski was involved in the examination of MNC's tax returns from 1985 to 1993 and again in 1996 and 1997. In his affidavit, Mr. Manikowski stated that he never questioned whether MNC had documentation to support its claims that tax basis was equal to book basis. He stated that, if he had known that MNC did not know the exact tax basis of the covered assets, IRS policy would have required him to place the burden on MNC to prove the tax basis. He goes on, however, to state that IRS policy allows a taxpayer to use an assumed number so long as it is based on "credible documentation" or through "other acceptable means." He did not explain what would be acceptable. In its answer to Plaintiff's Proposed Finding of Facts, defendant repeats Mr. Manikowski's standard: "[i]f the taxpayer does not know the tax basis of an asset and uses an assumed number for the tax basis, the estimated amount must be based on credible documentation."

We recognize that it is incumbent upon plaintiff to demonstrate that it is more likely than not that, *under the tax laws applicable at the time*, it would have been entitled to claim the $103 million in covered-asset losses. We believe, nevertheless, that under the standard articulated by defendant, plaintiff has met its burden.

Plaintiff is admittedly unable to generate an asset-by-asset list of tax basis. This is not due to any lack of diligence on the part of plaintiff's predecessors in interest or subsequent shoddy bookkeeping on its part. Instead, this is the result of the poor condition of Beverly Hills's records at the time of acquisition.[16] Mr. Revell's assertion that the tax basis at acquisition was at least equal to book basis is nevertheless supported by the Coopers and Deloitte reviews. These reviews, completed near the time of Beverly Hills's acquisition and unrelated to this litigation, show that the covered assets' tax basis likely exceeded book basis by at least $210 million. MNC has consistently filed its tax returns based on the underlying assumption that the tax basis of the covered assets were equal to their book basis. Further, both the IRS and the agencies privy to the Assistance Agreement audited MNC from 1989 to 1994 but never challenged the tax basis of the covered assets. In fact, both FSLIC and FDIC benefited from this prior reliance on the sufficiency of the records plaintiff inherited because they shared in the tax savings before passage of the Guarini legislation.

It is noteworthy that Dr. Erickson conceded that he did not hold the opinion that the aggregate tax basis in the covered assets was less than the aggregate book basis. He also stated that he did not observe any tax charge-off that had not also been taken for book basis. Finally, he could not identify any covered asset in which the tax basis was lower than the book basis. Dr. Erickson's report simply points to what is true, but ultimately not controlling: it would be preferable if Beverly Hills had maintained better records prior to its being taken over by the government.

We note, moreover, that this is a breach of contract case. Although damages depend on assumptions concerning tax laws, the ultimate standard of proof is controlled by contract law. This standard was expressed recently by the Federal Circuit: "[W]here responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision: 'It is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation.'" *See Bluebonnet Sav. Bank,* 266 F.3d at 1355 (quoting *Specialty Assem-*

---

**16.** We note that the government was willing to overlook the poor condition of the records both at the time it ultimately persuaded MNC to acquire Beverly Hills and again after incorporating the tax-sharing provisions into the Assistance Agreement.

*bling & Packing Co. v. United States,* 174 Ct.Cl. 153, 355 F.2d 554 (1966)); *San Carlos Irrigation & Drainage Dist. v. United States,* 111 F.3d 1557, 1563 (Fed.Cir.1997). Plaintiff's assertions of comparable tax deductions were sufficient for the government before the Guarini legislation, and we have no reason to think that the amount of lost deductions plaintiff now claims are not a reasonable approximation of the damages it suffered. Plaintiff has offered sufficient evidence that it suffered $103,155,357 in lost tax deductions as a result of the breach.

*Estoppel*

 Dr. Erickson offers the alternative argument that plaintiff should be held to an internal valuation of its present claim made at the time of MNC's original 2001 tax return. The material facts are not disputed. As discussed above, MNC paid a dividend-in-kind (or property dividend) to NAB in conjunction with ABN AMRO's acquisition of MNC. The dividend-in-kind was the right to this litigation.[17] The dividend was reported by MNC on its 2001 tax return and by NAB to the Office of the Comptroller of the Currency.

In order to assist KPMG Consulting in its valuation of the dividend, Ernest Antczak, MNC's former Director of Corporate Taxes, was asked to provide an analysis of the total covered-asset losses denied as a result of the Guarini legislation. After conducting a brief analysis, he found support for approximately $86.79 million in lost deductions. He noted at his deposition that he used this figure because it was the only amount he could document at the time. He believed the lost deductions actually exceeded $100 million. Further, he testified that he located additional documents in late 2002 relating to covered assets not included in his initial estimate that would have offered support for $105 million in lost deductions. Ultimately, after accounting for other factors such as the likelihood of recovery, KPMG Consulting valued the dividend at $350,000. In 2003 and after Mr. Revell's report supported $103 million in lost tax deductions, MNC amended its 2001 tax return to reflect the increased value of the dividend. As a result, MNC paid an additional $23,105 in taxes.[18] The amendment was filed subsequent to Dr. Erickson's report. Consequently, he did not know of the amendment at the time of his report.

Based on Mr. Antczak's dividend-in-kind analysis, Dr. Erickson argues that any damage award to NAB should be reduced by $5.73 million. He arrived at this figure by subtracting $86.79 million from $103.16 million and multiplying it by the 35% corporate tax rate. Dr. Erickson alleges that the resulting $5.73 million figure represents the overstatement in plaintiff's claim for damages.

Although Dr. Erickson was proffered as an accounting expert, he is essentially asserting a legal estoppel theory—since plaintiff's original 2001 tax return incorporated a lower figure than the one it proposes here, we should hold it to that earlier number.[19] Even

17. Plaintiff disputes that the rights to this litigation were "assigned" to NAB. Instead it asserts that it retained the rights to this litigation by MNC's payment of the dividend-in-kind to NAB. This distinction is immaterial because defendant's argument is based on the valuation made as part of the calculation of the dividend-in-kind, not the characterization of the transfer of ownership of the rights to this litigation. Thus, plaintiff fails to identify a dispute over an issue of material fact.

18. Defendant disputes these facts, offering the following arguments: (1) Mr. Revell's computation does not address why there was a discrepancy; (2) the amendment is effectively an admission of an understatement of MNC's taxable income; (3) defendant's expert did not possess information about the dividend-in-kind, its valuation, or MNC's original 2001 tax return until

one week before his report was due; and (4) MNC only amended its 2001 tax return at the request of plaintiff's counsel. None of these arguments challenge the existence of the amendment. They are justifications for why the court should ignore the amendment and hold plaintiff to the superseded valuation made in conjunction with the original 2001 tax return. As a result, defendant fails to identify a dispute over a genuine issue of material fact.

19. We note that neither defendant nor its expert concedes that plaintiff actually suffered $86.79 million in lost tax deductions. Instead, defendant argues that any award should be reduced by the difference between Mr. Antczak's initial evaluation and plaintiff's current claim. For all practical purposes, however, his argument is that plaintiff should be estopped from claiming lost deductions in excess of its initial evaluation.

assuming that such an argument is proper from Dr. Erickson, defendant offers little legal support for its expert's claim. Defendant's reliance on *In re Insilco Corp.*, 53 F.3d 95, 99 (5th Cir.1995), is misplaced. In that case, the Fifth Circuit upheld the Bankruptcy Court's decision prohibiting a party from amending a prior tax return seeking a $14 million tax refund. The taxpayer in that case sought to recharacterize a single exchange of stock for cash and stock as a series of individual transactions. The Fifth Circuit held that the Danielson rule "applies to preclude [a party] from recharacterizing its transaction and reaping favorable tax benefits." *Id.* at 98. At oral argument in this case, defendant asserted that the Danielson rule bars a party from doing anything to alter a prior agreement, including its valuation.[20] Defendant's reading of the Danielson rule is overly broad. It is plain from *Insilco* that the Danielson rule only precludes a party from unilaterally recharacterizing or recasting the *form* of a prior transaction to reap favorable tax consequences. *Id.* at 97. Here, unlike *Insilco*, plaintiff has not recharacterized the form of its transaction but has merely revalued one component of the formula used to calculate the appropriate dividend-in-kind.

Thus, defendant fails to identify a legal or equitable basis to hold plaintiff to Mr. Antczak's initial estimate of lost tax deductions. Further, we refuse to hold plaintiff to an initial valuation which we have no reason to believe is more accurate than the later figure. As we have noted in a prior case, "[a]lthough [defendant's expert] is free to criticize plaintiff['s] tax reporting to the IRS, the court simply uses numbers from plaintiff['s] actual returns to calculate contract damages." *First Heights Bank, F.S.B. v. United States*, 57 Fed.Cl. 162, 170 (2003). MNC's current tax return is consistent with its position before this court. We will not go beyond it. The proper forum for challenging plaintiff's tax returns is an IRS audit.

*Delay to Increase Guaranteed Yield*

Defendant also asserts that any damage award should be reduced by $4.55 million because MNC failed to submit timely requests to FSLIC for book loss reimbursements. Of the $103.16 million in lost tax deductions that NAB claims, $38 million of these relate to tax deductions for the years 1989 through 1991. The IRS disallowed tax deductions for those years because MNC did not receive FSLIC approval for reimbursement of the book losses on those assets until after March 4, 1991, the effective date of the Guarini legislation. Dr. Erickson asserts that MNC could have submitted requests and received approval from FSLIC for book loss reimbursements prior to the effective date of the Guarini legislation. However, Dr. Erickson asserts that MNC, motivated by a desire to prolong guaranteed yield payments, made an improper business decision to delay submission of write-down requests to FSLIC. These yield payments were made by the government to Beverly Hills as a way of guaranteeing the thrift a minimum return on covered assets. Dr. Erickson calculates that plaintiff could have avoided the loss of $12.99 million in tax deductions if it had more promptly submitted write-down requests to FSLIC. Specifically, he proposes a cut-off period of six months from the end of the calendar year in which the request could have been made.

Plaintiff points out that Dr. Erickson's "six-month rule" has no basis in law. It asserts that defendant's claim, though framed in terms of causation, is a refashioned version of the duty-to-mitigate argument offered by the government and rejected by this court in *First Nationwide Bank v. United States*, 56 Fed.Cl. 438, 444 (2003) (holding that failure-to-mitigate argument was without merit because defendant could not show that plaintiff failed to act reasonably). Plaintiff also claims that the duty to mitigate is an affirmative defense that was waived as it was not raised in defendant's answer, and that in any event, the argument is irrelevant be-

---

**20.** *Commissioner v. Danielson*, 378 F.2d 771, 775 (3d Cir.), *cert. denied*, 389 U.S. 858, 88 S.Ct. 94, 19 L.Ed.2d 123 (1967) ("[A] party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc.").

cause FDIC released MNC and its successors from any and all claims related to MNC's performance under the Assistance Agreement. Finally, it offers evidence that it did not intentionally delay write-down requests and that the agency was pleased with its management of the covered assets.

We need not address plaintiff's claims that it did not act improperly or that defendant's answer waived or released this defense because we agree that defendant's argument has no basis in law. Dr. Erickson, apparently recognizing that there is no contractual or legal time limit between claiming the deduction and seeking write-down approval, simply makes one up—six months. Defendant, however, cannot point to a single instance in which a deduction was disallowed merely because it violated Dr. Erickson's six-month rule. In his deposition, Dr. Erickson acknowledged that the IRS did not have such a rule: "I don't see how they could have applied the analysis in my section VI [regarding the six-month rule] to the audit that was completed up to ten years prior to the date of issue of my report." Dep. Tr. p. 380. When pressed on the issue, he admitted that his six-month rule and his corresponding analysis were the "result of this litigation." *Id.*[21] He also admitted there were instances in which FSLIC approved write-down requests and the IRS allowed deductions for those losses in violation of his six-month rule.

In sum, there is no evidence or legal basis to conclude that such a rule would have barred plaintiff's claims in the absence of the Guarini legislation. Moreover, defendant does not explain how, in 1990, plaintiff could have been certain that legislation passed in 1993 would retroactively eliminate tax deductions for covered-asset losses not submitted to FSLIC or FDIC before March 4, 1991. Defendant's argument fails to raise a genuine issue as to causation.[22]

*Tax–Sharing Ratio*

▮ Finally, defendant argues that plaintiff is only entitled to 50% of any tax benefits lost as a result of the Guarini legislation. During oral argument, defendant conceded that no specific provision in either the Assistance Agreement or the Termination Agreement dictated a 50% sharing rate. Instead, defendant offers parole evidence that the parties agreed that the language of the original Assistance Agreement concerning the sharing ratio was defective—the flaw alluded to above by which the shift from a 75/25 ratio to a 50/50 ratio would never be triggered.[23] It argues that the parties intended to fix this problem in the Termination Agreement, which, when taken as a whole, manifests the parties' intention to share all tax benefits equally. Defendant also claims that the agency would never have entered into the Termination Agreement unless it believed it had resolved the issue of the flawed formula, and that plaintiff cannot rely on the formula in the Assistance Agreement because defen-

---

**21.** Defendant characterizes these facts as misleading because they are taken out of context. It argues, just as Dr. Erickson did, that the IRS never had an opportunity to apply Dr. Erickson's rule to this plaintiff because it was created after the enactment of the Guarini legislation. This does not identify a genuine issue of material fact as it concedes the point that the rule did not exist on the effective date of the Guarini legislation

**22.** Alternatively, defendant argues that any damage award should be reduced by $1.66 million in guaranteed yield payments MNC received as a result of these delays. As it is based on Dr. Erickson's six-month rule, we find that this argument is also without merit. Assuming, however, that plaintiff intentionally delayed its write-down requests to increase FDIC's yield payments, defendant has not argued that plaintiff did not have the right to do so under the contract. These payments were guaranteed by the Assistance Agreement. Further, the agency was given au-

thority to oversee plaintiff's management of its covered assets and was able to direct write downs if it believed plaintiff was violating the spirit of the Assistance Agreement. Thus, plaintiff would have been acting within its rights under the agreement even if it had intentionally delayed write-down requests.

**23.** Section 1(kk) was described as "flawed" in Defendant's Proposed Finding of Fact 248. In its written response, plaintiff argued that there was no guarantee that MNC would realize its initial investment plus a 20% return, thus triggering the shift from 25% to 50%. At oral argument, however, plaintiff conceded that the formula in section 1(kk) was defective as written. Further, plaintiff's witness, Mr. Antczak, stated in one of his depositions that there was a conceptual error in the formula. Based on the above, we find that plaintiff fails to identify a disputed issues of material fact.

dant would have brought suit to reform the contract had they failed to settle the dispute.

Unfortunately, if the intent of the parties was to make permanent a comprehensive 50/50 ratio, they neglected to capture it in the Termination Agreement. Read literally, there is nothing that establishes this ratio with respect to the current claim. The best defendant can do is point to provisions which incorporate a 50/50 ratio in other circumstances. For example, it points to section 2.6(f)(iii) of the Termination Agreement, which states: "If there is an [Other Tax Benefit] Item Adjustment, the FDIC Manager shall pay to Independence One [formerly Beverly Hills]—(A) $175.00 for each $1,000.00 of decreases in the amount of other Tax Benefit Items, for the first $171,929,851.00 of such decreases."[24] Section 2.6(f)(iii) of the agreement is inapplicable, however, as it applies only to payments from FDIC to plaintiff, not by plaintiff to FDIC.

Section 2.6(f)(vi) of the Termination Agreement addresses payments by the thrift to the agency. It only requires plaintiff to share 50% of its tax benefits in two circumstances, however:

*Independence One Payment.* If either—

(A) an action of the IRS or the U.S. Congress permanently increases the amount of Other Tax Benefit Items, or

(B) an action of the FDIC Manager of the FDIC OIG permanently increases the amount of Other Tax Benefit Items,

then Independence One and MNC shall pay to the FDIC Manager an amount equal to seventeen and one-half percent (17.5%) of the increase, together with an amount equal to thirty-one and one-half percent (31.5%) of an allocable portion of the interest, if any.

This section addresses the possibility of Congressional or agency action[25] that might result in an *increase* in tax benefits. It plainly does not apply to tax benefits that were eliminated by the breach or to their recovery by means of litigation.

The Termination Agreement does, however, unambiguously address the proper tax-sharing formula under the present circumstances. Section 8.4 states in relevant part:

If MNC and Independence One assert a claim or claims ("Claims") against a party other than the FDIC Manager for damages and for refunds of federal and state taxes and/or for the redetermination of liability for federal and state taxes for the taxable years 1989 and thereafter, and such claims arise out of or relate to the enactment of [the Guarini legislation] or the application of [the Guarini legislation] to MNC, then the amount of damages or refunds sought in such claims shall not include the amount that would have accrued to the benefit of the FDIC Manager under the Assistance Agreement or ... under this Agreement.

The Termination Agreement thus incorporates the Assistance Agreement for the limited purpose of calculating a damage award for plaintiff's Guarini claim. A literal reading of the Assistance Agreement results in a tax-sharing rate of 75% to plaintiff and 25% to the agency. Though it may have been flawed as originally drafted, both the plaintiff and the agency reaffirmed it when they executed the Termination Agreement. Further, the agreement is unambiguous and contains an integration clause evidencing the contract's full integration. *See McAbee Constr., Inc. v. United States,* 97 F.3d 1431 (1996) (holding that there is a strong presumption that an agreement containing an integration clause is fully integrated).

Despite the plain language of the Termination Agreement and the strong presumption that it is fully integrated, defendant asks the court to consider extrinsic evidence that the tax-sharing rate was 50/50. It points to the deposition testimony of Ernest Antczak. He recalled, without having reviewed the records, that the Termination Agreement contemplated a 50% tax-sharing rate for all future tax benefits. Mr. Antczak's recollection, however, is irrelevant for purposes of

---

**24.** Defendant points out that 175 divided by 1000 is 17.5%, which is 50% of the 35% corporate federal tax rate.

**25.** For example, a repeal of the Guarini legislation.

interpreting the contract—parole evidence may not be considered in view of the clarity of the contract. Defendant also points to other extrinsic evidence that Mr. Antczak believed the tax-sharing ratio for future tax benefits shifted to 50/50 with the enactment of the Termination Agreement. It too may not be considered. The Termination Agreement specifically addressed the appropriate tax-sharing rate to be applied for such claims. Defendant is bound by the agreement as written.

Defendant's additional argument that it would have brought suit to correct the flawed formula is also without merit. While it is uncontested that the formula in 1(kk) as originally written was "flawed," defendant never brought such a claim. Even if we were to interpret defendant's argument as a request that the formula be reformed by this court, we would be unable to grant relief because doing so would not reflect the parties' intent as evidenced by the Termination Agreement.[26] Here, the Termination Agreement evidences a clear willingness to rely on the original formula in the Assistance Agreement.[27]

## CONCLUSION

For the reasons set out above, defendant's motion for summary judgment is denied. Plaintiff's motion is granted. The Clerk is directed to enter judgment for plaintiff in the amount of $27,101,530. Costs to plaintiff.

---

**26.** Restatement (Second) of Contracts § 155 states, "Where a writing that evidences or embodies an agreement in whole or in part fails to express the agreement because of a mistake of both parties as to the contents or effect of the writing, the court may at the request of a party reform the writing to express the agreement." See also Aetna Const. Co. v. United States, 46 Ct.Cl. 113, 1910 WL 919 (1911).

**27.** The equitable doctrine of laches would, in any event, bar reformation. The parties continued to operate under the formula in the Assistance Agreement even though they recognized the flaw. See Bannum, Inc. v. United States, 60 Fed.Cl. 718, 727 (2004) ("The defense of laches requires that (1) the [party] delayed filing suit for an unreasonable and inexcusable length of time from the time he knew or reasonably should have known of his claim . . . and (2) the delay operated to the prejudice or injury of the [other party].").